**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| KAI ABRAHAMSEN, Individually and on Behalf of All Others Similarly Situated, | X<br>)<br>)<br>) |
| Plaintiff, | ) |
| v. | ) |
| BIOVERATIV INC., JOHN G. COX, ALEXANDER J. DENNER, LOUIS J. PAGLIA, BRIAN S. POSNER, ANNA PROTOPAPAS, GENO GERMANO, BLINK ACQUISITION CORP., and SANOFI, | ) |
| Defendants, | ) |

Civil Action No. _____

**CLASS ACTION COMPLAINT FOR VIOLATIONS OF SECTIONS 14(e) AND 20(a) OF THE SECURITIES EXCHANGE ACT OF 1934**

**JURY TRIAL DEMAND**

**CLASS ACTION COMPLAINT**

Plaintiff Kai Abrahamsen ("Plaintiff"), individually and on behalf of all others similarly situated, alleges the following upon information and belief, including investigation of counsel and review of publicly-available information, except as to those allegations pertaining to Plaintiff, which are alleged upon personal knowledge:

**NATURE OF THE ACTION**

1.      Plaintiff brings this class action on behalf of the public stockholders of Bioverativ Inc. ("Bioverativ" or the "Company") against Bioverativ's Board of Directors (the "Board" or the "Individual Defendants") for their violations of Section14(e) and 20(a) of the Securities Exchange Act of 1934, arising out of the Board's attempt to sell the Company to Sanofi through its wholly-owned subsidiary Blink Acquisition Corp. ("Merger Sub").

2.      Defendants have violated the above-referenced Sections of the Exchange Act by causing a materially incomplete and misleading Schedule 14D-9 Recommendation Statement

(the "Recommendation Statement") to be filed with the Securities and Exchange Commission ("SEC") on February 8, 2018.  The Recommendation Statement recommends that Bioverativ stockholders tender their shares in favor of a proposed transaction (the "Proposed Transaction") whereby Bioverativ is acquired by Sanofi. The Proposed Transaction was first disclosed on January 22, 2018, when Bioverativ and Sanofi announced that they had entered into a definitive merger agreement (the "Merger Agreement") pursuant to which Sanofi will acquire all of the outstanding shares of common stock of Bioverativ for $105.00 per share (the "Merger Consideration").  The deal is valued at approximately $11.6 billion.

3.     For decades, academic research has discussed the tendency of managers to focus on short-term gains over more value-creating, but longer-term, prospects.[1] An increase in stock price, for example, may be one such short-term gain. Yet attempts to increase stock price may backfire; one study found that when CEOs focus on short-term stock price, they tend to act in ways that actually reduce value.[2] Ergo, stock price is not always indicative of value.

4.     Bioverativ's main product, Eloctate, has seen impressive growth over the past two years and is poised for further growth. Yet the Board's myopic focus on the stock price has led it to sell the Company less than a year after it became an independent company. Even if the Proposed Transaction was the best way to maximize shareholder value in the short term, the Merger Consideration is inadequate given the Company's long-term growth prospects. The expected growth of Eloctate sales and the potential of a blockbuster drug acquired months after the Company became independent from Biogen Inc. demand a price that adequately reflects these prospects. And the quick sales process raises questions about whether the Board was

---

[1] He, Zhaozhao and David Hirshleifer, "Managerial Scientific Expertise, Innovation, and Firm Performance," September 2017, at 1, *available at*
http://www.fmaconferences.org/Boston/PhD_CEO_Innovation_and_Firm_Performance_FMA.pdf.
[2] Edmans, Alex, Vivian W. Fang and Allen H. Huang, "The Long-Term Consequences of Short-Term Incentives," European Corporate Governance Institute, Finance Working Paper No. 527/2017, September 2017.

pressured into a sale on terms favorable to Sanofi.

5.     Furthermore, the Recommendation Statement is materially incomplete and contains misleading representations and information in violation of Sections 14(e) and 20(a) of the Exchange Act.  Specifically, the Recommendation Statement contains materially incomplete and misleading information concerning the sales process, financial projections prepared by Bioverativ management, as well as the financial analyses conducted by J.P. Morgan Securities LLC ("JPMorgan"), and Guggenheim Securities, LLC ("Guggenheim"), Bioverativ's financial advisors.

6.     For these reasons, and as set forth in detail herein, Plaintiff seeks to enjoin Defendants from taking any steps to consummate the Proposed Transaction unless and until the material information discussed below is included in an amendment to the Recommendation Statement or otherwise disseminated to Bioverativ's stockholders. In the event the Proposed Transaction is consummated without the material omissions referenced below being remedied, Plaintiff seeks to recover damages resulting from the Defendants' violations.

**PARTIES**

7.     Plaintiff is, and has been at all relevant times, the owner of shares of common stock of Bioverativ.

8.     Defendant Bioverativ is a corporation organized and existing under the laws of the State of Delaware. The Company's principal executive offices are located at 225 Second Avenue, Waltham, Massachusetts 02451. Bioverativ common stock trades on NASDAQ under the ticker symbol "BIVV." Bioverativ develops treatments for hemophilia and other rare blood disorders.

9.     Defendant John G. Cox has been CEO since July 2016 and a director of the

Company since January 10, 2017.

10. Defendant Alexander J. Denner has been a director of the Company since January 10, 2017.

11. Defendant Louis J. Paglia has been a director of the Company since January 10, 2017 .

12. Defendant Brian S. Posner has been a director of the Company since January 10, 2017. Posner is Chairman of the Board.

13. Defendant Anna Protopapas has been a director of the Company since February 28, 2017.

14. Defendant Geno Germano has been a director of the Company since May 11, 2017.

15. Defendants Cox, Denner, Paglia, Posner, Protopapas and Germano are collectively referred to herein as the "Board."

16. Defendant Sanofi is a French *société anonyme* with its principal executive offices in Paris, France.

17. Defendant Merger Sub a Delaware corporation and is a wholly owned subsidiary of Sanofi.

## JURISDICTION AND VENUE

18. This Court has subject matter jurisdiction pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1331 (federal question jurisdiction) as Plaintiff alleges violations of Section 14(e) and 20(a) of the Exchange Act.

19. Personal jurisdiction exists over each Defendant either because the Defendant conducts business in or maintains operations in this District, or is an individual who is either

present in this District for jurisdictional purposes or has sufficient minimum contacts with this District as to render the exercise of jurisdiction over Defendant by this Court permissible under traditional notions of fair play and substantial justice.

20.     Venue is proper in this District under Section 27 of the Exchange Act, 15 U.S.C. § 78aa, as well as under 28 U.S.C. § 1391, because: (i) the conduct at issue took place and had an effect in this District; (ii) Bioverativ maintains its primary place of business in this District; (iii) a substantial portion of the transactions and wrongs complained of herein, including Defendants' primary participation in the wrongful acts detailed herein, occurred in this District; and (iv) Defendants have received substantial compensation in this District by doing business here and engaging in numerous activities that had an effect in this District.

## CLASS ACTION ALLEGATIONS

21.     Plaintiff brings this action on his own behalf and as a class action on behalf of all owners of Bioverativ common stock and their successors in interest and/or their transferees, except Defendants and any person, firm, trust, corporation or other entity related to or affiliated with the Defendants (the "Class").

22.     This action is properly maintainable as a class action for the following reasons:

(a)     The Class is so numerous that joinder of all members is impracticable.  As of January 19, 2018, Bioverativ had approximately 108.2 million shares outstanding.

(b)     Questions of law and fact are common to the Class, including, inter alia, the following:

(i)     Whether Defendants have violated Section14(e) of the Exchange Act;

(ii)     Whether the Individual Defendants have violated Section 20(a) of the Exchange Act;

(iii)    Whether Plaintiff and the other members of the Class would be irreparably harmed were the transaction complained of herein consummated; and

(iv)    whether the Class is entitled to injunctive relief or damages as a result of Individual Defendants' wrongful conduct.

(c)     Plaintiff is committed to prosecuting this action, is an adequate representative of the Class, and has retained competent counsel experienced in litigation of this nature.

(d)     Plaintiff's claims are typical of those of the other members of the Class.

(e)     Plaintiff has no interests that are adverse to the Class.

(f)     The prosecution of separate actions by individual members of the Class would create the risk of inconsistent or varying adjudications for individual members of the Class and of establishing incompatible standards of conduct for the party opposing the Class.

(g)     Conflicting adjudications for individual members of the Class might as a practical matter be dispositive of the interests of the other members not parties to the adjudications or substantially impair or impede their ability to protect their interests.

(h)     Plaintiff anticipates that there will be no difficulty in the management of this litigation.  A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

## FURTHER SUBSTANTIVE ALLEGATIONS

### A. Background and the Proposed Transaction

23.     Before February 2, 2017, Bioverativ was a wholly owned subsidiary of Biogen,

Inc. Approximately 60% of Bioverativ's revenue comes from Eloctate, a hemophilia A drug. In 2016, Eloctate brought in $513 million in revenues. That was a 62% increase from 2015, and revenues in 2015 were almost five and half times more revenue than 2014. In the nine months ending September 30, 2017, Bioverativ had already made $516.5 million in revenues from Eloctate.

24. Eloctate is not the only hemophilia A treatment on the market. But according to the July 5, 2017 The Moley Fool article entitled "3 Reasons Sizzling-Hot Bioverativ Stock Can Go Even Higher," Eloctate is popular with patients and doctors, and analysts expected its performance "to continue driving Bioverativ shares higher."[3]

25. Shortly after Bioverativ went public, a Stifel Nicolaus analyst described Eloctate and Bioverativ's other major product, Alprolix, as "'cash cows' with strong growth prospects."[4] A Raymond James analyst stated that he expected Bioverativ to grow at a 10% compound annual growth rate, bringing in revenues of $1.48 billion by 2021. The analyst further stated: "We believe Bioverativ shares offer a unique mix of newly launching assets, a diverse development pipeline, and a strong balance sheet, all of which leaves it well positioned in this competitive area."[5]

26. Bioverativ expanded its assets and development pipeline with the acquisition of True North Therapeutics in June 2017. True North Therapeutics had begun developing TNT009, a treatment for cold agglutinin disease, a chronic hemolytic condition that can (and often does) lead to severe anemia. The True North Therapeutics acquisition cost Bioverativ $400 million and

---

[3] Speights, Keith, "3 Reasons Sizzling-Hot Bioverativ Stock Can Go Even Higher," The Motley Fool, July 5, 2017, available at: https://www.fool.com/investing/2017/07/05/3-reasons-sizzling-hot-bioverativ-stock-can-go-eve.aspx.
[4] Deagon, Brian, "Biogen Spinoff Takes Flight With Focus On Hemophilia Drugs," Investor's Business Daily, March 10, 2017, available at: https://www.investors.com/research/the-new-america/biogen-spinoff-takes-flight-with-focus-on-drugs-for-hemophilia/?ven=DJCP&src=AURLABO.
[5] Id.

assumed cash, with up to $425 million more payable based on certain milestones. But in the May 23, 2017 press release announcing the acquisition, the Company stated that it believes TNT009 and the acquisition generally would "create significant value for our shareholders over the long term." An analyst at Cowen estimates that TNT009 could see sales up to $1.6 billion and add $24 per share to the Company's stock price.[6]

27.     Despite the Company's strong growth prospects and current success, the Board entered into the Merger Agreement with Sanofi and Merger Sub on January 21, 2018. No market check was done, and the Board agreed to sell the Company to Sanofi just a few months after deciding that the Company was not for sale.

28.     The swift sales process raises questions. Defendant Denner, founding partner and Chief Investment Officer of Sarissa Capital Management LP—which stands to make over $122 million from the Proposed Transaction—played a major role in selling the Company. Defendant Denner received the first contact from Sanofi's financial advisor in May 2017. After being told four times that Bioverativ was not for sale, Sanofi's financial advisor reached out again to Defendant Denner in October 2017, who told them to offer a price high enough to avoid a pre-signing market check. The Recommendation Statement is silent as to whether Defendant Denner was authorized to give such advice or otherwise discuss a transaction.

29.     It worked. On November 3, 2017, Sanofi offered a price high enough to convince the Board to consider a sale to Sanofi. Sanofi's financial advisor contacted Defendant Denner on December 29, 2017 to suggest that the CEOs of both companies meet, two days after contacting Guggenheim and JPMorgan to suggest a meeting between Defendant Posner and the Chairman of the Sanofi board of directors. The Recommendation Statement is silent as to whether

---

[6] Gatlin, Allison, "Could Biogen Spinoff Bioverativ Have A Blockbuster On Its Hands?" Investor's Business Daily, July 10, 2017, available at: https://www.investors.com/news/technology/could-biogen-spinoff-bioverativ-have-a-blockbuster-on-its-hands/?ven=DJCP&src=AURLABO

Defendant Denner informed the Board of this request.

30.     At a meeting of the Board on January 3, 2018, Defendant Posner asked each member of the Board if they would consider selling the Company. The next day, the Board authorized Defendant Denner to negotiate with Sanofi's financial advisor for a price of $105.00. Somehow, in the middle of the Board meeting, Defendant Denner received a call from Sanofi's financial advisor and was able to get a commitment for $105.00 per share from Sanofi. Receiving its preferred price, the Board agreed to sell Bioverativ to Sanofi.

31.     However, the Merger Consideration—$105.00 per share—is not a fair price for Bioverativ stockholders. The Company has incredible growth prospects and has already seen success with its Eloctate product. The TNT009 product shows great promise. And Sanofi will reap the benefits going forward.

32.     In fact, Sanofi has commented on the benefits of the Proposed Transaction. In a letter dated January 22, 2018, Sanofi CEO Olivier Brandicourt stated that "Bioverativ is a leader in the growing hemophilia market – the largest market for rare diseases," and acquiring Bioverativ is "part of [Sanofi's] strategic priority to 'Reshape the Portfolio' and focus on areas where we currently have, or can effectively build, a leadership position."

33.     Sanofi has already planned to enter new markets with Bioverativ's drug products, increasing its market share:





34.     A total $10 billion market for hemophilia drugs, combined with Sanofi's plans to expand Bioverativ's products into new markets, means Sanofi will benefit from expanded sales.

35.     Even the analyses of the Company's own financial advisors illustrate that the Merger Consideration may not be high enough. For example, JPMorgan's *WholeCo Discounted Cash Flow Analysis* implied a per share equity value as high as $117.25, while Guggenheim's *Stand-Alone Going-Concern Discounted Cash Flow Analysis* implied a per share equity value as high as $112.00.

**B.  Bioverativ's Officers Stand to Receive Benefits Unavailable to the Class**

36.     The Recommendation Statement acknowledges that the Company's executive officers have interests in the merger that may differ from those of the stockholders and may create conflicts of interest.

37.     Options and restricted stock units ("RSU") that have been awarded to and are held by Bioverativ's executive officers and directors will vest and be converted into the right to receive either the Merger Consideration or another amount. The treatment of these equity awards, in addition to benefits provided to executive officers through the Company's Severance

10

Plan for U.S. Executive Officers, will create a windfall for Bioverativ's executive officers that is unavailable to the common stockholders. As demonstrated in the following chart, three of Bioverativ's executive officers stand to receive more than $109 million, if they are let go without "cause" or leave under certain circumstances, after the Proposed Transaction closes:

| Name | Cash | Equity | Perquisites/ Benefits | Tax Reimbursement | Total |
|------|------|--------|----------------------|-------------------|-------|
| John G. Cox | $3,267,945 | $68,918,594 | $142,108 | TBD | $72,328,647 |
| John T. Greene | $1,432,791 | $17,001,379 | $106,081 | TBD | $18,540,251 |
| Rogério Vivaldi Coelho, M.D. | $1,146,233 | $17,001,379 | $115,592 | TBD | $18,263,204 |

38.     The members of the Board and the executive officers stand to gain handsomely no matter whether they stay or leave after the Proposed Transaction closes. In total, as demonstrated in the following chart, the executive officers and Board members will receive more than $300 million:

| Name | Total RSU Consideration | Total Option Consideration | Total Share Consideration |
|------|------------------------|---------------------------|--------------------------|
| ***Bioverativ Executive Officers*** | | | |
| John G. Cox | $33,770,940 | $41,589,604 | $7,180,530 |
| John T. Greene | $6,727,455 | $10,273,924 | $52,500 |
| Rogério Vivaldi Coelho, M.D. | $6,727,455 | $10,273,924 | $33,075 |
| Andrea DiFabio | $6,320,790 | $7,209,743 | $1,426,320 |
| Lucia Celona | $5,649,840 | $6,308,563 | $869,400 |
| Richard Brudnick | $5,796,630 | $6,308,563 | $1,105,965 |
| Timothy Harris, Jr. | $5,478,900 | $3,324,208 | $40,320 |
| ***Directors*** | | | |
| Brian S. Posner | $668,220 | $1,802,481 | $702,765 |
| Alexander J. Denner | $572,775 | $1,622,221 | $122,850,105 |
| Louis J. Paglia | $572,775 | $1,622,221 | $530,880 |
| Anna Protopapas | $572,775 | $1,217,478 | $110,880 |
| Geno Germano | $572,775 | $1,085,581 | – |

## C. The Preclusive Deal Protection Devices

39.     As part of the Merger Agreement, Defendants agreed to certain preclusive deal protection devices that ensure that no competing offers for the Company will emerge.

40.     By way of example, section 6.02(a) of the Merger Agreement includes a "no

solicitation" provision barring the Company from soliciting or encouraging the submission of an acquisition proposal. Section 6.02(a) also demands that the Company cease and terminate all solicitations, discussions or negotiations with any party concerning an acquisition proposal. No "go-shop" period is provided that would allow the Board to rightfully seek out a better offer for the company.

41.     Despite already locking up the Proposed Transaction by agreeing not to solicit alternative bids, the Board consented to additional provisions in the Merger Agreement that further guarantee the Company's only suitor will be Sanofi. For example, pursuant to section 6.02(g) of the Merger Agreement, the Company must notify Sanofi of any offer, indication of interest, or request for information made by an unsolicited bidder. Thereafter, should the Board determine that the unsolicited offer is superior, section 6.02(f) requires that the Board grant Sanofi four (4) business days (if requested by Sanofi) to negotiate the terms of the Merger Agreement to render the superior proposal no longer superior.  Sanofi is able to match the unsolicited offer because, pursuant to section 6.02(f) of the Merger Agreement, the Company must provide Sanofi with the identity of the party making the proposal and the material terms of the superior proposal, eliminating any leverage that the Company has in receiving the unsolicited offer.

42.     In other words, the Merger Agreement gives Sanofi access to any rival bidder's information and allows Sanofi a free right to top any superior offer.  Accordingly, no rival bidder is likely to emerge and act as a stalking horse for Bioverativ, because the Merger Agreement unfairly assures that any "auction" will favor Sanofi and allow Sanofi to piggy-back upon the due diligence of the foreclosed second bidder.

43.     In addition, pursuant to section 8.01(d) of the Merger Agreement, Bioverativ must pay Sanofi a termination fee of $326 million if the Company decides to pursue another offer, thereby essentially requiring that the alternate bidder agree to pay a naked premium for the right to provide the shareholders with a superior offer.

44.     Ultimately, these preclusive deal protection provisions restrain the Company's ability to solicit or engage in negotiations with any third party regarding a proposal to acquire all or a significant interest in the Company. The circumstances under which the Board may respond to an unsolicited written bona fide proposal for an alternative acquisition that constitutes or would reasonably be expected to constitute a superior proposal are too narrowly circumscribed to provide an effective "fiduciary out" under the circumstances. Likewise, these provisions also foreclose any likely alternate bidder from providing the needed market check of Sanofi's inadequate offer price.

**D.  The Materially Incomplete and Misleading Recommendation Statement**

45.     The Individual Defendants owe the stockholders a duty of candor. They must disclose all material information regarding the Proposed Transaction to Bioverativ stockholders so that they can make a fully informed decision whether to tender their shares in favor of the Proposed Transaction.

46.     On February 8, 2018, Defendants filed the Recommendation Statement with the SEC. The purpose of the Recommendation Statement is, inter alia, to provide the Company's stockholders with all material information necessary for them to make an informed decision on whether to tender their shares in favor of the Proposed Transaction. However, significant and material facts were not provided to Plaintiff and the Class. Without such information, Bioverativ shareholders cannot make a fully informed decision concerning whether or not to tender their

shares in favor of the Proposed Transaction.

*Materially Misleading Statements/Omissions Regarding the Management-Prepared Financial Forecasts*

47.     The Recommendation Statement discloses management-prepared financial projections for the Company which are materially misleading.  The Recommendation Statement indicates that in connection with the rendering of JPMorgan's fairness opinion, JPMorgan reviewed "the Management Projections prepared by the management of the Company relating to its business." The Recommendation Statement indicates that in connection with its fairness opinion, Guggenheim reviewed "certain non-public business and financial information regarding the Company's business and prospects (including the Management Projections for the years ending December 31, 2018 through December 31, 2035), all as prepared and provided to Guggenheim Securities by the Company's senior management." Accordingly, the Recommendation Statement should have, but failed to, provide certain information in the projections that Bioverativ's management provided to the Board, JPMorgan and Guggenheim.

48.     Notably, Defendants failed to disclose (a) revenue by specific product; (b) gross margin by specific product; (c) expenses allocated to each specific product, (including but not limited to, (i) selling, general, and administrative expenses, (ii) depreciation and amortization, (iii) stock based compensation expense, (iv) research and development expenses, (v) changes in net working capital, and (vi) capital expenditures); (d) unallocated selling general and administrative expenses, (e) unallocated depreciation and amortization, (f) unallocated stock based compensation expense (g) unallocated research and development costs, (h) unallocated changes in net working capital, (i) unallocated capital expenditures, (j) EBITDA by specific product (k) EBIT by specific product, (l) operating income by specific product, (m) taxes, (n) any other adjustments or line items used in the calculation of unlevered free cash flow, including

but not limited to the "certain unidentified expenses including selling, general and administrative and research and development expense," and (o) unlevered free cash flow by specific product. This omitted information is necessary for Bioverativ stockholders to make an informed decision on whether to tender in favor of the Proposed Transaction.

### *Materially Incomplete and Misleading Disclosures Concerning JPMorgan's Financial Analyses*

49.     First, with respect to the *Sum-of-the-Parts Discounted Cash Flow Analysis,* the Recommendation Statement fails to disclose what are the different "parts" into which the Company was segmented for purposes of this analysis.  Also, what were the specific "certain revenue producing parts of the Company" that were included in determining the terminal asset value growth rate selected by JP Morgan. It also fails to disclose what is the unlevered free cash flow metric to which the selected terminal asset value growth rate was applied. Additionally, the Recommendation Statement fails to disclose what are the individual inputs and assumptions used by JP Morgan to derive the discount rate range of 8.25% - 10.25%. Finally, what is the range of implied terminal EBITDA multiples resulting from this analysis.

50.     Second, with respect to the *Discounted Cash Flow Analysis,* what is the range of implied terminal EBITDA multiples resulting from this analysis.

51.     Third, with respect to the *Selected Precedent Transactions Analysis*, the Recommendation Statement fails to disclose whether JP Morgan performed any type of benchmarking analysis for Bioverativ in relation to the target companies. The Recommendation Statement also fails to disclose what were the actual multiples observed which JP Morgan decided were not meaningful.

52.     Finally, with respect to the *Selected Companies Analysis,* the Recommendation Statement fails to disclose whether JP Morgan performed any type of benchmarking analysis for

Bioverativ in relation to the selected public companies. The Recommendation Statement also fails to disclose what were the actual multiples observed which JP Morgan decided were not meaningful.

### *Materially Incomplete and Misleading Disclosures Concerning Guggenheim's Financial Analyses*

53.     First, with respect to the *Discounted Cash Flow Analysis,* the Recommendation Statement fails to disclose, (a) what were the specific existing and pipeline products on which the Sum-of-the-parts DCF was based; (b) what were the specific terminal year normalized after tax unlevered free cash flow metrics to which the selected perpetuity growth rates were applied, for each DCF; (c) what are the individual inputs and assumptions utilized by Guggenheim Securities to derive the discount rate range of 8.5%-10.5%; and (d) what were the implied terminal EBITDA multiples from each of the DCF analyses.

54.     Second, with respect to the *Selected Precedent Merger and Acquisition Transactions Analysis*, the Recommendation Statement fails to disclose (a) whether any type of benchmarking analysis was performed for Bioverativ in relation to the target companies; (b) what are the individual implied per share ranges resulting from the application of the selected ranges of multiples in the analysis; and (c) what are the following individual multiples for each of the selected transactions analyzed by Guggenheim Securities, (i) EV/NTM Adj. EBITDA and (ii) P/NTM EPS.

55.     Finally, with respect to the *Selected Publicly Traded Companies Analysis,* the Recommendation Statement fails to disclose (a) whether any type of benchmarking analysis was performed for Bioverativ in relation to the selected public companies; (b) what are the individual implied per share ranges resulting from the application of each of the selected ranges of multiples in this analysis; and (c) what are the following individual multiples for each of the

selected public companies analyzed by Guggenheim Securities, (i) EV/2018 Adj. EBITDA and (ii) P/2018E EPS.

### *Materially Incomplete and Misleading Disclosures Concerning the Flawed Process*

56.     The Recommendation Statement also fails to disclose material information concerning the sales process. For example, the Recommendation Statement notes that JPMorgan did not have a "material financial advisory or other material commercial or investment banking relationships" with either Bioverativ or Sanofi. But there is no explanation of what is meant by "material" or whether there were other relationships that are not "material" but may otherwise pose a conflict.

57.     The Recommendation Statement fails to disclose the basis for Defendant Denner informing Sanofi's financial advisor to offer a "preemptive price" in October 2017, whether he was authorized by the Board to have this conversation and whether Defendant Denner discussed a price that might be considered "preemptive" with Sanofi's financial advisor.

58.     The Recommendation Statement also fails to disclose the preliminary illustrative valuation analysis of Bioverativ presented by JPMorgan and Guggenheim at the November 21, 2017 Board meeting.

59.     In addition, the Recommendation Statement fails to disclose whether Defendant Denner informed the Board of his discussion with Sanofi's financial advisor on December 29, 2017.

60.     The Recommendation Statement also fails to disclose how each member of the Board answered Defendant Posner's question of January 3, 2018, about whether they would consider a sale of the Company at that time.

61.     In addition, the Recommendation Statement fails to disclose the basis for the Board deciding that $105.00 shares in cash was the appropriate value for the Company, and whether the Board discussed alternative transaction structures, including a stock-for-stock transaction.

62.     This information is necessary to provide Company stockholders a complete and accurate picture of the sales process and its fairness.  Without this information, stockholders were not fully informed as to the defendants' actions, including those that may have been taken in bad faith, and cannot fairly assess the process. And without all material information, Bioverativ stockholders are unable to make a fully informed decision in connection with the Proposed Transaction and face irreparable harm, warranting the injunctive relief sought herein.

63.     In addition, the Individual Defendants knew or recklessly disregarded that the Recommendation Statement omits the material information concerning the Proposed Transaction and contains the materially incomplete and misleading information discussed above.

64.     Specifically, the Individual Defendants undoubtedly reviewed the contents of the Recommendation Statement before it was filed with the SEC.  Indeed, as directors of the Company, they were required to do so.  The Individual Defendants thus knew or recklessly disregarded that the Recommendation Statement omits the material information referenced above and contains the incomplete and misleading information referenced above.

65.     Further, the Recommendation Statement indicates that on January 21, 2018, JPMorgan and Guggenheim reviewed with the Board their financial analyses of the Merger Consideration delivered to the Board an oral opinion, which was confirmed by delivery of a written opinion dated January 21, 2018, to the effect that the Merger Consideration was fair, from a financial point of view, to Bioverativ shareholders. Accordingly, the Individual

Defendants undoubtedly reviewed or were presented with the material information concerning JPMorgan's and Guggenheim's financial analyses which has been omitted from the Recommendation Statement, and thus knew or should have known that such information has been omitted.

66.     Plaintiff and the other members of the Class are immediately threatened by the wrongs complained of herein, and lack an adequate remedy at law. Accordingly, Plaintiff seeks injunctive and other equitable relief to prevent the irreparable injury that the Company's shareholders will continue to suffer absent judicial intervention.

## CLAIMS FOR RELIEF

### COUNT I

**On Behalf of Plaintiff and the Class Against All Defendants for Violations of Section14(e) of the Exchange Act**

67.     Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

68.     Defendants have filed the Recommendation Statement with the SEC with the intention of soliciting Bioverativ shareholder support for the Proposed Transaction.  Each of the Individual Defendants reviewed and authorized the dissemination of the Recommendation Statement, which fails to provide the material information referenced above.

69.     In so doing, Defendants made materially incomplete and misleading statements and/or omitted material information necessary to make the statements made not misleading. Each of the Individual Defendants, by virtue of their roles as officers and/or directors of Bioverativ, were aware of the omitted information but failed to disclose such information, in violation of Section 14(e).

70.     Section 14(e) of the Exchange Act provides that in the solicitation of shares in a

tender offer, [i]t shall be unlawful for any person to make any untrue statement of a material fact or omit to state any material fact necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading[.]"

71.    Specifically, and as detailed above, the Recommendation Statement violates Section 14(e) because it omits material facts concerning: (i) management's financial projections; (ii) the value of Bioverativ shares and the financial analyses performed by JPMorgan and Guggenheim in support of its fairness opinion; and (iii) the sales process.

72.    Moreover, in the exercise of reasonable care, the Individual Defendants knew or should have known that the Recommendation Statement is materially misleading and omits material information that is necessary to render it not misleading.  The Individual Defendants undoubtedly reviewed and relied upon the omitted information identified above in connection with their decision to approve and recommend the Proposed Transaction; indeed, the Recommendation Statement states that JPMorgan and Guggenheim reviewed and discussed their financial analyses with the Board during various meetings including on January 19, 2018 and January 21, 2018, and further states that the Board relied upon JPMorgan's and Guggenheim's financial analyses and fairness opinions in connection with approving the Proposed Transaction. The Individual Defendants knew or should have known that the material information identified above has been omitted from the Recommendation Statement, rendering the sections of the Recommendation Statement identified above to be materially incomplete and misleading.

73.    The misrepresentations and omissions in the Recommendation Statement are material to Plaintiff and the Class, who will be deprived of their right to make an informed tender decision if such misrepresentations and omissions are not corrected prior to the close of the tender period.  Plaintiff and the Class have no adequate remedy at law.  Only through the

exercise of this Court's equitable powers can Plaintiff and the Class be fully protected from the immediate and irreparable injury that Defendants' actions threaten to inflict.

<u>**COUNT II**</u>

**On Behalf of Plaintiff and the Class against the Individual Defendants for Violations of Section 20(a) of the Exchange Act**

74.     Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

75.     The Individual Defendants acted as controlling persons of Bioverativ within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By virtue of their positions as officers and/or directors of Bioverativ and participation in and/or awareness of the Company's operations and/or intimate knowledge of the incomplete and misleading statements contained in the Recommendation Statement filed with the SEC, they had the power to influence and control and did influence and control, directly or indirectly, the decision making of the Company, including the content and dissemination of the various statements that Plaintiff contends are materially incomplete and misleading.

76.     Each of the Individual Defendants was provided with or had unlimited access to copies of the Recommendation Statement and other statements alleged by Plaintiff to be misleading prior to the time the Recommendation Statement was filed with the SEC and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

77.     In particular, each of the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company, and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the Exchange Act violations alleged herein, and exercised the same.  The omitted information identified above was reviewed by the Board prior to voting on the Proposed Transaction.  The Recommendation

Statement at issue contains the unanimous recommendation of each of the Individual Defendants to approve the Proposed Transaction. They were, thus, directly involved in the making of the Recommendation Statement.

78.    In addition, as the Recommendation Statement sets forth at length, and as described herein, the Individual Defendants were involved in negotiating, reviewing, and approving the Merger Agreement. The Recommendation Statement purports to describe the various issues and information that the Individual Defendants reviewed and considered. The Individual Defendants participated in drafting and/or gave their input on the content of those descriptions.

79.    By virtue of the foregoing, the Individual Defendants have violated Section 20(a) of the Exchange Act.

80.    As set forth above, the Individual Defendants had the ability to exercise control over and did control a person or persons who have each violated Section 14(e), by their acts and omissions as alleged herein. By virtue of their positions as controlling persons, these defendants are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of Individual Defendants' conduct, Plaintiff and the Class will be irreparably harmed.

## RELIEF REQUESTED

WHEREFORE, Plaintiff demands injunctive relief in his favor and in favor of the Class and against the Defendants jointly and severally, as follows:

A.    Declaring that this action is properly maintainable as a Class Action and certifying Plaintiff as a Class Representative and his counsel as Class Counsel;

B.    Preliminarily and permanently enjoining Defendants and their counsel, agents, employees and all persons acting under, in concert with, or for them, from proceeding with, consummating, or closing the Proposed Transaction, unless and until Defendants disclose the

material information identified above which has been omitted from the Recommendation Statement;

      C.     In the event that the transaction is consummated prior to the entry of this Court's final judgment, rescinding it or awarding Plaintiff and the Class rescissory damages;

      D.     Directing the Defendants to account to Plaintiff and the Class for all damages suffered as a result of their wrongdoing;

      E.     Awarding Plaintiff  the costs and disbursements of this action, including reasonable attorneys' and expert fees and expenses; and

      F.     Granting such other and further equitable relief as this Court may deem just and proper.

### JURY DEMAND

Plaintiff demands a trial by jury.

Dated: February 16, 2018

**HUTCHINGS BARSAMIAN MANDELCORN, LLP**

*/s/Theodore M. Hess-Mahan*
Theodore M. Hess-Mahan BBO #558109
110 Cedar Street, Suite 250
Wellesley Hills, MA 02481
Tel: (781) 431-2231
thess-mahan@hutchingsbarsamian.com

**ROWLEY LAW PLLC**
Shane T. Rowley
Danielle Rowland Lindahl
50 Main Street, Suite 1000
White Plains, NY 10606
Tel: (914) 400-1920
Fax: (914) 301-3514

*Attorneys for Plaintiff*